UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>AGRICULTURAL CONTRACTING SERVICES ASSOCIATION, et al.,<br><br>Defendants. | No. 1:19-cr-00003-DAD<br><br>ORDER DENYING DEFENDANTS' MOTIONS FOR JUDGMENT OF ACQUITTAL AND A NEW TRIAL<br><br>(Doc. Nos. 248, 249, 250, 251) |

This matter is before the court on defendant Agricultural Contracting Services Association, dba American Labor Alliance ("ALA") and defendant Marcus Asay's motion for a judgment of acquittal, or in the alternative, motion for a new trial (Doc. No. 248) and defendant Antonio Gastelum's motion for a judgment of acquittal, or in the alternative, motion for a new trial (Doc. No. 250), filed on December 9, 2024 (Doc. No 250). The defendants each joined in the motion filed by the other defendant(s). (Doc. Nos. 249, 251.) The government filed its oppositions to those motions on January 10, 2025. (Doc. Nos. 252, 253.) Defendants filed their replies on February 7, 2025. (Doc. Nos. 261, 264.)

This matter came before the court on April 10, 2025, for hearing on the pending motions and for sentencing. (Doc. No. 289.) The court considered the parties' briefing and the arguments

/////

1

of counsel and denied the motions from the bench, indicating that this written order providing further explanation for the court's ruling in this regard would follow.

## BACKGROUND

Defendants were charged in this action by way of a first superseding indictment. (Doc. No. 46.) Defendants ALA, Asay, and Gastelum were charged with conspiracy to commit mail fraud in violation of 18 U.S.C. §§ 1341 and 1349 (count one) and eleven counts of mail fraud in violation of 18 U.S.C. §§ 1341 (counts two through twelve). (*Id*. at 1–10.) Defendant Asay was also charged with money laundering in violation of 18 U.S.C. § 1956(a)(l)(B)(i) (count thirteen) and money laundering in violation of 18 U.S.C. § 1957 (count fourteen). (*Id.* at 11–12.) In addition, defendants Asay and ALA were charged with five counts of wire fraud in violation of 18 U.S.C. § 1343 (counts fifteen through nineteen). (*Id.* at 12–14.) After lengthy pretrial proceedings, the jury trial of this action commenced on April 25, 2024. (Doc. No. 146.) On June 18, 2024, the jury returned its verdict, finding defendants ALA and Asay guilty on all counts with which they were charged, and finding defendant Gastelum guilty on counts one, six, and seven and not guilty as to two through five and eight through twelve. (Doc. Nos. 223, 227.)

## LEGAL STANDARDS

**A.     Judgment of Acquittal**

"A defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." Fed. R. Crim. P. 29(c)(1). In reviewing a challenge to the sufficiency of the evidence, the court must ask whether, viewing "the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Hursh*, 217 F.3d 761, 767 (9th Cir. 2000) (quoting *United States v. Hubbard*, 96 F.3d 1223, 1226 (9th Cir. 1996)); *see also United States v. Sullivan*, 131 F.4th 776, 784 (9th Cir. 2025). The Supreme Court has established a two-step inquiry for considering a challenge to a conviction based on sufficiency of the evidence. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "First, a reviewing court must consider the evidence presented at trial in the light most favorable to the prosecution." *United States v. Lloyd*, 807 F.3d 1128, 1170–71 (9th Cir. 2015)

(citing *Jackson*, 443 U.S. at 319). "Second, the reviewing court must determine whether this evidence, so viewed, is adequate to allow *any* rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." *United States v. Katakis*, 800 F.3d 1017, 1023 (9th Cir. 2015) (internal ellipses and quotation marks omitted) (quoting *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc)). "[E]vidence is insufficient to support a verdict where mere speculation, rather than reasonable inference, supports the government's case, or where there is a total failure of proof of a requisite element." *Id.* (internal quotation marks and citations omitted). However, "the government does not need to rebut all reasonable interpretations of the evidence that would establish the defendant's innocence, or 'rule out every hypothesis except that of guilt beyond a reasonable doubt.'" *Nevils*, 598 F.3d at 1164 (quoting *Jackson*, 443 U.S. at 326); *see also United States v. Aubrey*, 800 F.3d 1115, 1127 (9th Cir. 2015).

**B.     New Trial**

In addition, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "A district court's power to grant a motion for new trial is much broader than its power to grant a motion for judgment of acquittal." *United States v. Kellington*, 217 F.3d 1084, 1095 (9th Cir. 2000). In considering a motion for a new trial, "[t]he district court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses." *Kellington*, 217 F.3d at 1095; *see also United States v. Katakis*, 252 F. Supp. 3d 988, 992 (E.D. Cal. 2017). "If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury." *Kellington*, 217 F.3d at 1097 (quoting *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980)). Nonetheless, such authority is to be exercised only where extraordinary circumstances are presented. *United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981) (A motion for a new trial "should be granted 'only in exceptional cases in which the evidence preponderates heavily against the verdict.'") (quoting Wright, Federal Practice and Procedure, Criminal § 553 at 487 (1969)); *see also United States v.*

*Imran*, 964 F.2d 1313, 1318 (2d Cir. 1992); *Katakis*, 252 F. Supp. 3d at 992.

## DISCUSSION

Defendants ALA and Asay advance three arguments in support of their motion for entry of a judgment of acquittal or, in the alternative, a new trial. The court addresses each in turn, and then turns to the six additional arguments upon which defendant Gastelum relies in his motion.

**A.    Defendants ALA and Asay**

    1.    <u>Investors Received the Benefit of what they Bargained for</u>

Defendants ALA and Asay first argue that the evidence admitted at trial in this case was insufficient to establish any misrepresentation that went to the nature of the parties' bargain, and that the government's theory was overbroad because it allowed the jury to convict even though the victims received the nature of the bargain. (Doc. No. 248 at 13.) They argue that the "essential point" is that each person who purchased the hardship waiver for purposes of the Affordable Care Act never was required to pay a penalty for not having medical insurance, and everyone who invested in the ALA pension program ultimately received back their investment plus interest. (*Id*. at 12.)

In opposition, the government argues that as to the hardship waiver, "[t]hat no government agency ultimately took enforcement action against the marginally employed victims swindled by the defendants does not mean that the product worked as claimed." (Doc. No. 253 at 7.) As to the ALA pension program, the government argues that ALA sold a product that did not exist, because ALA promised to hold the money in trust and cause it to grow through investments, "but no trust existed and no investments were made" and "defendants spent it on themselves." (*Id*.) As to the workers' compensation program, the government concedes that defendants ALA and Asay may have "supplied a thing of value" but argues that the product provided was materially different than that which was promised and was not what was sold or represented on the Certificates of Liability provided by defendants. (*Id*. at 8–9.)

In reply, defendants Asay and ALA argue that the evidence at trial showed that the hardship exemption did exist, because each member received low-cost medical coverage and a medical benefit card. (Doc. No. 261 at 3.) They also argue as to the pension program that there

4

was no evidence presented of defendants' intent to defraud because "all members of the retirement program had their investment with interest returned" and that as to the workers compensation insurance program defendants did provide workers' compensation coverage. (*Id*. at 4–5.)

As to the hardship waiver fraud, the court finds that there was ample evidence introduced at trial to support that defendants represented that the "hardship exemption" product would protect taxpayers from a penalty and meet the requirements of the Affordable Care Act from the previous year, but that in fact the waiver sold by defendants ALA and Asay could do no such thing. *See* Doc. No. 229 at 42–46 (summarizing the evidence in closing argument). That the government did not require victims of this aspect of the fraud to ultimately pay penalties for not having the required health insurance does not mean that the evidence was insufficient to establish that defendants made a misrepresentation going to the nature of the bargain. *See United States v. Benny*, 786 F.2d 1410, 1417 (9th Cir. 1986) ("Neither an honest belief by the defendant in the ultimate success of a plan nor the actual or intended repayment of the loan is itself a defense if the elements of the offense are established.").

As to the pension program, there was evidence introduced at trial that defendants represented to individuals that funds contributed to the ALA Trust would be held in trust and invested, but the money was instead spent on ALA business expenses. *See* Doc. No. 229 at 158–66 (summarizing evidence regarding the ALA Trust in closing argument). The court rejects the notion that later repayment of the funds with interest somehow prevents defendants from having had the "intent to defraud," since the fraud would have been complete at the time that false statements were made that caused people to part with money. *United States v. Molinaro*, 11 F.3d 853, 863 (9th Cir. 1993) ("[A] defendant's belief that the victim of the fraud will be paid in the future or will sustain no economic loss is no defense . . . ."); *United States v. Miller*, 953 F.3d 1095, 1103 (9th Cir. 2020) (wire fraud statute does not require intent to permanently deprive victim of money or property); *United States v. Sharma*, 851 F. App'x 708, 710 (9th Cir. 2021) (noting that the intent to deceive and cheat "requires only an intent to deprive the victim of money or property by means of deception" and not "an intent to *permanently* deprive a victim of money

5

or property") (emphasis in original); *United States v. Mautone*, No. 22-30180, 2024 WL 1693363, at *1 (9th Cir. Apr. 19, 2024)[1] ("Here, a rational trier of fact could have found that Mautone intended to deprive the victim of his money 'at least momentarily.'") (citation omitted).

Similarly, as to the workers' compensation insurance program, there was evidence introduced at trial that defendants ALA and Asay represented to the purchasers that the program was materially different (as in, backed by national insurance companies) than it actually was. *See* Doc. No. 229 at 167–171 (summarizing evidence in closing argument). That the victims received some degree of coverage, e.g. coverage provided solely by ALA as a self-insured, does not demonstrate that the defendants did not have the intent to defraud. *See United States v. Tarallo*, 380 F.3d 1174, 1182 (9th Cir. 2004) (holding that the defendant had committed mail fraud when he falsely told potential investors that he was calling from an office in D.C. to make his operation seem bigger than it was), *amended*, 413 F.3d 928 (9th Cir. 2005).

2. <u>Jury Instruction 24 was Vague, Ambiguous, and Misleading</u>

Next, defendants Asay and ALA argue that Jury Instruction 24, as reproduced below, was vague and misleading, particularly as to the emphasized portions:

> INSTRUCTION NUMBER 24
>
> A scheme or plan for obtaining money by means of false statements as charged here requires an intentional misrepresentation for the purpose of obtaining money.
>
> Deception does not amount to fraud simply because it results in money changing hands. Rather, to support a conviction for fraud, the misrepresentation(s) must *directly or indirectly deceive the victim about the nature of the bargain* itself. A misrepresentation will go to the nature of the bargain if it goes to an essential aspect of it, such as price, quality, or *advantages of the transaction. In this regard, the misrepresentation(s) must be capable of affecting the victim's understanding of the bargain and influencing their assessment of the nature or value of it.*

They argue that the court should have given the instruction that the defense in the *Milheiser* case requested:

/////

---

[1] Citation to unpublished Ninth Circuit opinions throughout this opinion is appropriate pursuant to Ninth Circuit Rule 36-3(b).

6

> A scheme or plan for obtaining money by means of false statements requires an intentional misrepresentation for the purpose of obtaining money to which one is not entitled.
>
> A misrepresentation amounting only to deceit is insufficient even if it causes another person to enter into a transaction that they would otherwise avoid.
>
> Rather, the misrepresentation must be coupled with a contemplated harm to the person that affects the very nature of the bargain itself, such as a discrepancy between the benefits reasonably anticipated because of the misrepresentation and the actual benefit which was delivered.
>
> The misrepresentation must be capable of affecting the person's understanding of the bargain and influencing their assessment of the value of the bargain. When the person receives exactly what they paid for, there is no fraud even if the person made the purchase because of the misrepresentation.

*United States v. Milheiser*, 98 F.4th 935, 940 (9th Cir. 2024). However, the Ninth Circuit in its decision in *Milheiser* neither embraced nor endorsed this instruction that the defense had requested before the trial court. Rather, the Ninth Circuit concluded only that the government had presented an overbroad theory of fraud to the jury and that this error was not remedied by an instruction telling the jury that "to support a conviction for fraud, a false statement must directly or indirectly deceive the victim about the nature of the bargain." *Id*. at 945.

As indicated above, defendants Asay and ALA take issue with Instruction 24 to the extent that it informed the jury that "to support a conviction for fraud, the misrepresentation(s) must *directly or indirectly deceive the victim about the nature of the bargain* itself." (Doc. No. 248 at 14.) They argue that this phrasing mislead the jury into considering indirect misrepresentations. (*Id*.) But as clearly stated by the Ninth Circuit in *Milheiser*, indirect misrepresentations are appropriately considered by the jury in determining whether the charged fraud has been proven by proof beyond a reasonable doubt. *Milheiser*, 98 F.4th at 944–45 ("We rejected the idea that only *direct* misrepresentations of the price, quality, or advantages of the transaction are material.") (emphasis in original).

Defendants Asay and ALA also argue that the "advantages of the transaction" language in Jury Instruction 24 as given by the court was ambiguous. (Doc. No. 248 at 14.) The court disagrees, and notes that not only is this phrasing in line with the Ninth Circuit's discussion in

7

*Tarallo* and *Milheiser*, but also that instructing the jury that a "misrepresentation will go to the nature of the bargain if it goes to an essential aspect of it, such as price, quality, or advantages of the transaction" was both in keeping with Ninth Circuit law and appropriate. *See Tarallo*, 380 F.3d at 1183 ("We explained that a fraud conviction could be maintained in *LeVeque* because the defendants materially misrepresented the advantages of their offer.") (internal citation and quotations omitted).

Defendants Asay and ALA further argue that the last sentence of the instruction, wherein the jury was told that "the misrepresentation(s) must be capable of affecting the victim's understanding of the bargain and influencing their assessment of the nature or value of it," was at odds with Ninth Circuit decisions recognizing that "misrepresentations which affect intangible property interest are not protected by the mail and wire fraud statutes." (Doc. No. 248 at 15.) The court rejects defendants' argument in this regard. The instruction given by the court does not invoke "intangible interests unconnected to property," because it specifically instructs the jury that a misrepresentation must be capable of influencing the victim's assessment of the nature or value of the bargain, and cannot simply be, for example, any untruthful statement made in the process of making a sale.

Finally, defendants Asay and ALA argue that Instruction 24 is deficient because the first sentence should have contained the phrase "to which one is not entitled," as proposed by the defense before the trial court in *Milheiser*. They argue that without this phrase, a jury could find fraud even if the misrepresentations made are not material. The court again disagrees, finding that the language in the instruction that "a misrepresentation will go to the nature of the bargain if it goes to an essential aspect of it, such as price, quality, or advantages of the transaction" prevented the jury from returning a guilty verdict based upon a misrepresentation that was not material.

3. <u>The Exclusion of Evidence Related to the Legal Status of the Workers' Compensation Program</u>

Defendants ALA and Asay next argue that the government was able to introduce into evidence eight exhibits mentioning MEWA and ERISA, but the defense was not permitted to

8

introduce any evidence regarding the legal status of ALA's workers' compensation insurance program, thereby preventing them from establishing a good faith defense. (Doc. No. 248 at 16.) The court refers back to its pretrial order resolving the parties' motions *in limine*:

> **The Government's Motion to Exclude Evidence Regarding the Legal Status of Defendants' Worker's Compensation Program**
>
> The government moves to exclude this evidence arguing: (1) it is irrelevant to the conspiracy to commit mail fraud charged in Count One of the First Superseding Indictment which specifically alleges only that defendants caused Certificates of Liability to be issued to their clients which contained materially false and fraudulent statements indicating that National Insurance Companies were providing the coverage, in many cases along with false policy numbers, when in fact this was not the case (Doc. No. 46 at 5–6); and (2) to allow irrelevant evidence relating to whether defendants were legally authorized to sell worker's compensation coverage at all under California law or were entitled to an exemption from state regulation as an Entity Claiming Exemption (ECE), would unduly confuse the issues the jury would be asked to resolve in light of the federal charges and would be a significant waste of the jury's and this court's time because it involves a complex dispute between defendants and the State of California, a dispute which has been being litigated for many, many years and still is not resolved. (Doc. No. 106.)
>
> Although counsel for defendants ALA and Asay filed an opposition to the government's motion, those defendants, in essence, do not oppose the motion. (*See* Doc. No. 112 at 1.) ("[D]efendants do not intend to introduce evidence that the defendants were legally selling one of their financial products i.e., Workers Compensation coverage[.]"). Instead, defendants ALA and Asay focus their opposition brief on the contention that they are entitled to present a good faith defense to the charges. (*Id*. at 2.) The government does not contest any of the defendants' right to mount a good faith defense, as long as it relates to truth or falsity of the misrepresentations alleged in the fraud counts of the First Superseding Indictment. (Doc. No. 116 at 1–3.) The court nonetheless anticipates this issue of the scope of a viable good faith defense will likely continue to be the subject of discussion throughout the trial.
>
> Counsel for defendant Gastelum, however, has opposed the government's motion in a more full-throated manner. (Doc. No. 113.) First, defendant Gastelum argues that the government's motion is both overbroad and at the same time insufficiently particular as to the evidence it seeks to exclude. [fn. omitted] (*Id*. at 2–3.) Defendant Gastelum does, however, concede that the jury at his trial will not need to decide whether "ALA could legally offer" what he characterizes as "this benefit" and which the government refers to as "Worker's Compensation coverage." (*Id*. at 3.) This concession is significant in the court's view. Nonetheless, defendant Gastelum argues that whether ALA could legally offer the coverage must at

least be touched upon in explaining his good faith defense. (*Id*. at 4.) [fn. omitted] Finally, in support of his opposition defendant Gastelum has submitted a copy of the Certificate of Liability; an email chain from August/September of 2016 between himself and others regarding the Certificates of Liability and other arguably related issues; a six page "status update" and timeline dated April 7, 2016, that he authored and sent to co-defendant Asay and a Jesse Solis addressing the larger issue of whether ALA was authorized to provide the coverage under state law but also apparently addressing the Certificates of Liability—stating that the state hadn't then yet determined whether to approve ALA's request "for inclusion of our workers compensation coverage certificates for all state regulatory and legal purposes"; and an August 26, 2016 opinion letter from attorney George J. Vasquez to co-defendant Asay regarding the legality of ALU's provision of worker's compensation benefits. (Doc. Nos. 113-2, 113-3, 113-4 and 113-5.)

In its reply the government argues that defendant Gastelum is certainly entitled to present a good faith defense based upon the contention that the allegedly false and fraudulent Certificates of Liability were mistakenly filled out and that ALA merely misunderstood the forms. (Doc. No. 116 at 2.) However, the government argues that defendant Gastelum may not present a good faith defense that is untethered from the actual fraud charged in the First Superseding Indictment. (*Id.* at 3–4.) In this regard, the government argues that defendant Gastelum is not entitled to present evidence that ALA was authorized to sell the coverage in question or that he was acting on the advice of now deceased counsel Vasquez that selling the coverage was lawful, because such evidence has no relevance to a good faith defense to the charge—misrepresenting that National Insurance Companies were providing the coverage to ALA clients. (*Id.* at 4.)

The court finds the government's argument in support of its motion *in limine* to be well-taken, to a point. [fn. omitted] As an overarching principal, the court agrees that in light of the very specific fraud charged (i.e., the misrepresentation that coverage was being provided by National Insurance Companies), the jury will not be asked to determine whether defendants were authorized to sell that worker's compensation coverage under California law. Indeed, as noted above, defendant Gastelum has conceded as much. Accordingly, the court will not allow evidence to be introduced or arguments to be made at trial that relate solely to that issue. However, it does appear that some of the evidence defendant Gastelum wishes to rely upon in support of his good faith defense specifically addresses the Certificates of Liability, how they were filled out at different times, communications with state regulators about the completion of the certificates and corrective actions that he took upon learning that ALA was providing information on the certificates reflecting the involvement of National Insurance Companies. In the court's view, that evidence is directly relevant to defendant Gastelum's good faith defense even though it also, in part, touches upon the issue of whether ALA was authorized to provide the coverage under California law. Although such evidence may be presented by the defense, the court will not allow the lawfulness of ALA providing the coverage to

10

>become the focus of the trial in this case. While at times this may be a fine line to walk, the court will do its best to walk it and will expect counsel to do the same.

(Doc. No. 121 at 2–5.)

Now, following trial, defendants Asay and ALA appear to argue that because the government introduced exhibits that made reference to MEWA or ERISA, they should have been able to introduce evidence regarding the legal status of the programs, even though the government did not base the fraud charges in the superseding indictment on the legality of any of ALA's offered programs. The court disagrees, finding that its previous *in limine* ruling was both appropriate and fairly applied to both parties at trial.[2]

**B.    Defendant Gastelum**

1.    Payment of Business Expenses was not Established as an Act of Fraud

Defendant Gastelum first argues that "the government failed to prove that funding ALA business expenses or even personal expenses of ALA employees would necessarily cause any of the alleged representations to be false." (Doc. No. 250 at 9.) He argues that in order to have done so, the government would have had to establish "what legal requirements actually applied to a pension offered by the labor organization ALA believed it was and held itself out to be." (*Id.*) Defendant Gastelum appears to argue that there was no legal requirement that the pension funds be held in trust, and that the government "created this duty out of whole cloth and used it in argument as evidence of [his] guilt." (Doc. No. 264 at 4.) However, defendant Gastelum does not contend that there was no evidence of representations made to plan participants that their funds would be held in trust. Indeed, he could not credibly so assert since there was evidence introduced at trial that representations were specifically made to participants that their funds would be held in trust and invested for their benefit. *See* Doc. No. 229 at 158–66 (summarizing evidence regarding the ALA Trust in closing argument). There was also evidence presented at trial that defendant Gastelum learned by at least 2016 that pension funds were not being invested

---

[2] As it turns out, the court accurately predicted pretrial that there would be some "overlap" because reference to MEWA or ERISA would occur during the lengthy trial. Nonetheless, at trial the pretrial ruling was enforced in an even-handed fashion with the defense ability to present a good faith defense to the fraud schemes as alleged in the indictment fully protected.

by ALA and that plan participants were being mailed fabricated quarterly statements, and that he himself was moving money between all accounts (pension, workers' compensation insurance, healthcare, operating, etc.). (Doc. No. 240 at 9–14.) The court finds that the evidence presented at trial was clearly sufficient to support the mail fraud charges of which defendant Gastelum was convicted. The court also rejects the contention that the government was required to establish what legal status what was represented by the defendants as a pension plan actually held, what legal duties thereby attached to defendant Gastelum as a result of that legal status, and that paying business expenses with funds from that pension plan vehicle constituted a violation of particular duties accompanying the plan's legal status.

        2.      <u>Defendant Gastelum Played No Role in Creating or Marketing the Pension</u>

Next, defendant Gastelum argues that he is entitled to judgment of acquittal or a new trial because all of the marketing materials pension plan participants relied on were created before he became associated with ALA, and as for marketing materials that he was responsible for, the government did not prove that they were ever used. (Doc. No. 250 at 10.) In opposition the government argues that this position is "misguided," because it is "irrelevant whether defendant Gastelum was personally involved in the marketing," because the question for the jury was "whether he knew how the scheme operated and participated in it." (Doc. No. 252 at 6.)

The court observes that as to count one on the verdict form, wherein the jury found defendant Gastelum guilty of the conspiracy to commit mail fraud charge, they marked the form reflecting their finding that the object of the conspiracy as "falsely marketing a pension plan called the ALA Trust." (Doc. No. 227 at 2.) Nonetheless, the court also agrees that the government was not required to prove that defendant Gastelum personally created marketing materials that were relied upon by victims in making their investment decision in order to support the jury's finding that he participated in this conspiracy. Certainly defendant Gastelum has cited no authority suggesting otherwise.

        3.      <u>Defendant Gastelum Acted in Good Faith to Protect the Pension Funds</u>

Next, defendant Gastelum argues that he is entitled to judgment of acquittal or a new trial because "the evidence was clear that [he] fixed what he saw to be an error in how ALA was

commingling its funds" and he "created a series of accounts" with an "amount sufficient to meet all of ALA's pension liability." (Doc. No. 250 at 10.) It is certainly plausible that the jury found the evidence of defendant Gastelum's actions on July 22, 2016, in moving $370,000 into a separate account, to be significant as to his involvement in the pension program fraud. As discussed at the hearing on these motions, the jury did acquit defendant Gastelum of the fraud charges relating to the mailing of statements to investors purportedly reflecting investment trust balances that were set before and on that date, while the jury convicted him of the two substantive counts involving mailings made after that date. The jury heard evidence, through defendant Gastelum's own testimony on cross-examination, that after he moved $370,000 from a workers' compensation insurance account into the 1499 account for the purpose of segregating that pension plan money on July 22, 2016, he moved that same money into a different 2198 account on October 24 and 25, 2016. (Doc. No. 240 at 12–13.) The jury then also heard evidence that on March 1, 2017, defendant Gastelum sent $36,353 from the 2198 account to a 5846 account for purposes of a "true-up" or "direct reimbursements" for ALA's Avanto healthcare exemption program. (*Id.* at 14, 21.) The jury next heard evidence that defendant Gastelum made two more transfers of approximately $9,835 and $31,000 from the 2198 account to the 5846 account in late April 2017. (*Id*. at 16–18.) The evidence at trial also included testimony that the 5846 account was then used for payment of thousands of dollars of business expenses for ALA, including payroll payments in August 2017, and American Express payments in January 2018. (*Id*. at 18–19, 24–27.) The court is therefore entirely unpersuaded by defendant Gastelum's argument that his actions on July 22, 2016, supported his good faith defense thus warranting a rejection of the jury's verdict finding him guilty of the substantive mail fraud counts involving fraudulent mailings to investors in January and October 2017.

        4.        <u>The Participants Got what they Bargained for</u>

Defendant Gastelum next argues that the government failed to produce evidence that the pension plan customers did not get what they bargained for. (Doc. No. 250 at 12.) He argues that "no redemptions were refused." (*Id*. at 11.) The court has already addressed a similar argument raised by defendants ALA and Asay, and again concludes that even if the victims of the pension

13

1    plan fraud were later repaid, those repayments do not mean that the participants received the

2    benefit of their bargain or that the defendants did not make material misrepresentations.  This is

3    particularly true here where the parties' bargain was represented as an offer by defendants to the

4    victims that their money would be held in trust and invested.  *See Tarallo*, 380 F.3d at 1182

5    ("Defendant's false statement that the invested funds would be placed in a trust and would be safe

6    there was material under both the mail fraud and securities fraud standards.  Such a statement has

7    a natural tendency to influence a potential investor's decision to invest, and a reasonable investor

8    would find the level of risk to be important in deciding whether to invest.").

9       5.   <u>The Purported Variance Between the Indictment and Proof at Trial</u>

10   Defendant Gastelum next argues that there was a fatal variance between the indictment

11   and the government's case presented at trial.  In this regard, he relies upon the government's

12   closing argument in which it was suggested that defendant Gastelum "had a duty to call the police

13   and to tell pension participants of the commingling of funds he has found and corrected" but

14   "failed to request the Court instruct the jury on this alleged duty."  (Doc. No. 250 at 12.)

15   "A variance involves a divergence between the allegations set forth in the indictment and

16   the proof offered at trial.  Where this divergence acts to prejudice the defendant's rights, the

17   conviction must be reversed."  *United States v. Ward*, 747 F.3d 1184, 1189–90 (9th Cir. 2014).

18   For example, in *United States v. Tsinhnahijinnie*, the defendant was indicted for engaging in

19   abusive sexual contact with a minor over a two-month period within the confines of a reservation,

20   but the trial testimony suggested that the defendant had perpetrated the sexual abuse over a

21   significantly different period of time at locations both on and off the reservation.  *Tsinhnahijinnie*,

22   112 F.3d 988, 991 (9th Cir. 1997).  The Ninth Circuit found that this variance prejudiced the

23   defendant's rights.  *Id*.

24   Here, in addressing defendant Gastelum's conduct the government argued in closing as

25   follows:

26   > He knew the false quarterly statements were mailed out, as he
> testified to.  He knew the quarterly statements were going out, but
27   > the money wasn't invested, because he told Alanna Evans that it
> wasn't invested or earning interest.  He knew that it had been used
28   > on business expenses, because he had to do the "true-up" with

14

> workers' comp funds. But yet, he let those quarterly pension statements keep going out, telling people their money was safe. *He didn't call the police*. He didn't stop it. He kept it going. He wanted Asay and ALA to keep going. When people wanted their money back, like Rigoberto Solorio, what did he do? He went back to the workers' comp funds and paid him back with workers' comp money. He had to borrow from workers' comp time and again to cover for the pension plan.
>
> Finally, he made incriminating admissions to Alanna Evans and others at the Department of Labor when interviewed, as we discussed. And he also tried to hide information from the Department of Labor, testimony and evidence you saw yesterday.
>
> After his interview with Ms. Evans, the Department of Labor asked for the retirement plan account statements. What did Mr. Gastelum do? He conveniently sent only a few statements, but left out the month where he did the transfer from the workers' comp account. He didn't want the Department of Labor to see there was only $11.40 in the retirement account and that he replaced it with workers' comp money because he knew that they would get in trouble and that would put an end to their endeavor, so he hid it from the Department of Labor.
>
> That, ladies and gentlemen, is evidence of his state of mind, his intent to deceive and cheat people out of their money. His knowledge of what was really going on. I've included here on this slideshow a table summarizing the mailings that are in Counts 2 through 9. This is for your reference. It shows the date, on-or-about date, of the mailing along with the exhibit number and names of the victim.

(Doc. No. 229 at 26–27.)

The court finds that the emphasized portion of this closing argument above does not reflect a variance between the charges set forth in the superseding indictment and the proof offered at trial, let alone establish prejudice to defendant Gastelum. Taken in context, the government merely argued to the jury that defendant Gastelum participated in the misuse of pension plan investor funds, which is what the superseding indictment alleges, and not that he was guilty of some other, uncharged, offense involving a failure to alert the authorities.

      6.    <u>Circumstantial Evidence</u>

In his reply brief, defendant Gastelum argues that the jury instructions given by the court were inadequate because "the jury was not instructed that circumstantial evidence that supports two reasonable conclusions must be viewed in favor of the conclusion that points to the defendant's innocence" and that he "asked for this instruction but it was not given." (Doc. No.

15

264 at 5.) The court discussed this issue with counsel during the first of the two jury instruction conferences held during the trial. As was discussed at that conference, defendant Gastelum requested that the court give a California state law pattern instruction. That California pattern instruction, CALCRIM Model Instruction 224, instructs jurors that "[i]f you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence." The Ninth Circuit Model 6.8 Direct and Circumstantial Evidence Instruction which the court gave in this case explicitly states that "[t]he law makes no distinction between the weight to be given to either direct or circumstantial evidence" and tells the jury that it is for them "to decide how much weight to give to any evidence." Accordingly, the court did not give defendant Gastelum's requested CALCRIM instruction. Doing so was not in error.

**CONCLUSION**

Given the arguments presented, the court is unpersuaded by defendants' claim that no rational trier of fact could have found the essential elements of the crimes for which they were convicted beyond a reasonable doubt or that the evidence preponderates sufficiently heavily against the jury's verdict. Accordingly, both motions for judgment of acquittal and/or new trial (Doc. Nos. 248, 250) are DENIED.

IT IS SO ORDERED.

Dated:   **April 15, 2025**

DALE A. DROZD
UNITED STATES DISTRICT JUDGE